# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **MARY "HOLLY" LAMAR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:23-cv-00747** |
| **RUSSELL "RUSTY" BOLES,** | ) | **Judge Aleta A. Trauger** |
| **MATTHEW NORMAN, and** | ) | |
| **DARREN RIDER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Before the court is the Motion to Dismiss (Doc. No. 14) filed by defendants Russell "Rusty" Boles, Matthew Norman, and Darren Rider, citing Rule 12(b)(6) of the Federal Rules of Civil Procedure and seeking dismissal of all of the claims brought against them in plaintiff Mary "Holly" Lamar's Complaint (Doc. No. 1). For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.    FACTUAL ALLEGATIONS[1]

The Complaint alleges that defendant Boles is employed by the State of Tennessee as a captain with the Tennessee Wildlife Resources Agency ("TWRA"); that defendant Norman is a TWRA officer; and that defendant Rider is a colonel employed by the TWRA. (Doc. No. 1 ¶¶ 4–6.) The plaintiff is "highly trained and knowledgeable" about the care of birds of prey and the field

---

[1] The facts set forth herein are summarized from the facts alleged in the Complaint and from documents that are referred to in the Complaint and material to the plaintiff's claims but that were filed, not with the Complaint itself, but as exhibits to the parties' briefing on the Motion to Dismiss.

of "falconry," which is the "sport of using trained [birds of prey] to hunt small animals." (*Id.* ¶ 8.) She has long possessed various kinds of birds, including falcons, hawks, eagles, and owls, all of which are considered birds of prey. (*Id.*) She started a company, "Wing Blade Falconry – Bird of Prey Displays and Education," to promote awareness of birds of prey and the practice of falconry. (*Id.* ¶ 9.)

The possession and use of birds of prey is highly regulated by federal and state laws and regulations. (*Id.* ¶ 11.) In 2020, Lamar began actively seeking to obtain the necessary federal and Tennessee state permits to engage in falconry and falconry-related activities within Tennessee. (*Id.* ¶ 12.) In 2021, she obtained her Tennessee master falconry permit and various federal permits, and she "set out to comply with all relevant Tennessee bird laws and regulations relating to those permits." (*Id.*)

In the course of this effort, she contacted Captain Walter Cook, then TWRA's Captive Wildlife Coordinator and the head permitting official for the regulation of the use and possession of birds of prey in Tennessee. According to Lamar, Cook provided her with "guidance" in complying with Tennessee regulations. (*Id.* ¶ 14.) For example, on February 19, 2021, Cook copied her on an email that appeared to confirm his understanding that, under Tennessee law, she was allowed to possess five "raptors" pursuant to her falconry permit "for hunting purposes only" and that the TWRA would not have jurisdiction of "raptors that are not native to Tennessee," unless Lamar listed them on her state falconry permit in order to use them for hunting. (*Id.*; *see also* Doc. No. 20-7.)[2] According to Lamar's understanding of the February 19, 2021 email, this meant that, if she did not intend to use a particular non-native bird for falconry (hunting), she did not need to

---

[2] Lamar explains that "raptor" is a "term of art under Tennessee's 'falconry' regulation" that includes certain species of birds of prey. (Doc. No. 1, at 3 n.1.)

list it on her falconry permit, even if it technically fell within the regulatory definition of "raptor." (Doc. No. 1 ¶ 14.) Cook allegedly also told Lamar that she was legally allowed to "conduct and charge money for educational falconry experiences with exotic [*i.e.*, non-native] raptors not on her falconry permit." (*Id.* ¶ 15.)

At some point after that email communication, Cook retired, and defendant Boles became the new Captive Wildlife Coordinator. Lamar began communicating with Boles in connection with her continued attempts to obtain all the necessary permits and ensure that she was in compliance with the laws regulating the possession and use of birds of prey in Tennessee.

In the spring of 2022, Boles began telling the plaintiff that he believed that she was in violation of various Tennessee laws and regulations due to the number of birds she possessed and how she was using them. However, according to Lamar, Boles also admitted that "he did not understand the applicable regulations." (*Id.* ¶ 19.) Based on his admitted lack of understanding, Boles told Lamar that he would not "move forward" with any legal action against her until he was able to get a legal opinion. (*Id.* ¶ 20.) Although Boles expressed to Lamar that he was opposed to her "profiting" from the use of birds of prey, she had permits allowing her to use captive birds of prey for falconry education (as distinct from falconry/hunting itself). (*Id.* ¶ 21.) In addition, Boles had "actual or constructive knowledge" of a male falconer in Tennessee who had been engaging in similar activities since 2019, but TWRA took no action against him. (*Id.*)

Lamar explained to Boles that, based on her understanding of the rules, she was permitted to use birds of prey that were not native to Tennessee for her paid falconry shows and that, in any event the law did not prohibit her from "doing paid shows with captive-bred indigenous birds of prey pursuant to her federal falconry school permit." (*Id.* ¶¶ 22–23.) Boles disagreed with her and told her he would need to consult the U.S. Fish and Wildlife Service for more information.

He also told her that, even if she had committed rules violations, "the consequence would be merely 'like getting a speeding ticket.'" (*Id.* ¶ 25.) When she expressed concern that he was going to show up at her house to seize her birds, he assured her that he would not do that without calling her first. (*Id.* ¶ 27.) He also told her not to sell or transfer any of her birds in the meantime, because, in his view, she had already violated the law. (*Id.* ¶ 29.) Lamar relied on Boles and did not make any changes. She also refrained from using her federal Falconry Education permit for five months, based on Boles' telling her it was illegal, even though she knew that it was not and that others in Tennessee were engaged in similar conduct.

In Lamar's discussions with Boles, he repeatedly referred her to Tennessee's falconry regulation, Tenn. Comp. R. & Regs. 1660-01-02.-.03, but without notifying her that the version of the regulation posted on TWRA's falconry website had not been updated in several years and was not the version actually in effect at the time. TWRA did not update the version posted on its website until August 2022, after legal process was issued against Lamar. The distinction was material, according to Lamar, insofar as the 2018 version of the regulation posted on TWRA's website defined the term "raptor" to include fewer bird species as compared to the 2022 (and current) version of the term "raptor."[3] (Doc. No. 1 ¶¶ 33–34.) Boles knew or should have known that Lamar was relying on the outdated version of the regulations posted on TWRA's website, based on their communications. (*Id.* ¶ 35.) However, Lamar also states that she was never out of compliance with the current regulation either. (*Id.* ¶ 34.)

---

[3] The term "raptor" is defined by the current regulatory definition as "a live migratory bird of the family Accipitriformes (excluding the American Bald Eagle), the family Falconiformes, or the family Strigidae." Tenn. Comp. R. & Regs. 1660-01-02-.03(1)(a) (effective 8/2/2021). According to Lamar, the term was defined in the 2018 version to include only a "live migratory bird of the family Accipitriformes or the great horned owl (Bubo virginian[u]s) of the family Strigidae." Tenn. Comp. R. & Regs. 1660-01-02-.03(1)(a) (Sept. 2018). (*See* Doc. No. 27-1.)

In May 2022, in response to a request from Boles and in the context of her requesting
assistance in making sure she was complying with all applicable rules and regulations, Lamar sent
Boles a list of certain birds she possessed, including some birds she owned in other countries but
sought to import to her home in Tennessee. (*Id.* ¶¶ 36–37; *see also* Doc. No. 15-2 ("list of birds").)
On July 25, 2022, after two more months of unsatisfactory back-and-forth with Boles, Lamar filed
a formal complaint with the TWRA regarding Boles and requested a meeting with TWRA's
general counsel and executive director. She explained that Boles had been unresponsive, unhelpful
generally in assisting her in complying with Tennessee rules, and had repeatedly provided
inaccurate information or, at any rate, "provided interpretations [of the regulations] that were
wildly divergent from [those] of his predecessor and decades of previous TWRA interpretation as
well as the understanding of nationally recognized falconry organizations." (Doc. No. 1 ¶ 39.)
Lamar also sent emails to TWRA officials informally complaining about Boles and expressing her
concern that she would suffer wrongful legal action, despite being in full compliance with the law.
(*Id.* ¶ 40.)

Defendant Rider, head of TWRA's Law Enforcement Division, called Lamar in response
to the complaints. Over the next few days, Lamar had several conversations with Rider and with
Boles in which she continued to explain why she was in compliance with the law and requested a
meeting with the "chief legal counsel and/or the Executive Director" for the purpose of resolving
any misunderstandings. Other falconers and falconry organizations also communicated with Boles
and other TWRA officials supporting Lamar's position and her interpretations of the governing
regulations. (*Id.* ¶¶ 41–44.)

During the same time frame, Boles and defendant Norman, with Rider's approval, began
the process of obtaining a warrant to seize Lamar's birds and pursuing criminal charges against

her. Because they could not obtain agreements with private facilities to keep and take care of the birds following seizure, the initial plan was to "move forward with the search warrant for certain evidence" but not seize the birds. (*Id.* ¶¶ 45–48.) Defendant Norman, at the direction of and in collaboration with Boles and with Rider's authorization, obtained a search warrant on August 2, 2022, just days after Lamar lodged the complaint against Boles and following numerous conversations with Rider and other TWRA officials verbally expressing complaints against Boles. (*Id.* ¶¶ 49, 55.)

The search warrant authorized seizure of all "live raptors and raptor parts or meat," as well as "photographs, cell phone data, and other electronic materials 'which tend[] to memorialize the illegal take and/or possession of raptors,'" "equipment used to video possession, sale, or transfers of raptors," and "equipment associated to [sic] live trap raptors." (*Id.* ¶ 51.) Probable cause to support the search warrant, which came primarily from the list of birds Lamar had provided Boles at his request, was premised upon the following allegations set forth in defendant Norman's Search Warrant affidavit:

> 1. Your affiant learned on or about June 28, 2022 that Captive Wildlife Captain Rusty Boles (hereafter referred to as CPT Boles) was contacted by Ms. Lamar on or about May 26th, 2022 about applying for a state Animal Damages Control, Propagation, and Education permit. At which point CPT Boles asked Ms. Lamar for a record of all raptors in her current possession. Ms. Lamar listed a Barn Owl on that list of raptors. Ms. Lamar stated that she has in her possession approximately 11 raptors. This puts her (a Master Falconer) over her legal limit of (5) raptors she can possess in Tennessee by approximately 6 raptors. This is in reference to the Rules and Regulations 1660-01-02. Rules and Regulations are governed by the Tennessee Wildlife Commission who get their authority from TCA 70-1-206. Under 70-1-206 the Commission can set Rules and Regulations. The Rules and Regulations state in Rule and Regulation 1660-01-02 that a Master Falconer can have only 5 raptors in their possession.
>
> 2. CPT Boles learned from a concerned citizen that Ms. Lamar had purchased a Barn Owl on May 13, 2022. A Form 3-186A was not filed for that sale to the US Fish and Wildlife Service or the state of TN. Ms. Lamar does not have an Animal Damage Control Permit from the state of TN which would make any federal permits invalid. Ms. Lamar purchased the Barn Owl under her Federal Abatement permit,

which would not be valid. This is in reference to TCA 70-4-414 [which] states that
the rules stated in 1660-01-02 must be followed. TCA 70-4-414 is a class B
misdemeanor by TCA 70-4-102 which states that all Rules and Regulations are
class B misdemeanor charges.

(Doc. No. 15-1, at 3; *see also* Doc. No. 1 ¶¶ 50, 52–53.)

As set forth in the affidavit, Norman's belief that probable cause existed to support issuance

of the Search Warrant was further based on his "4 plus years of wildlife law enforcement

experience" and knowledge of "how falconers store and display their raptors":

I know that falconers will use their cellular telephone cameras, and video capable
equipment to take photographs and videos of their raptors and store them at their
house, outbuildings or vehicles. I know that photographs and videos of raptors are
kept in digital photo albums stored in cellular telephones [and elsewhere].
Additionally, I know that raptor parts and feathers from raptors that have died, will
be stored/displayed at houses, vehicles or outbuildings. The equipment used to trap
and maintain raptors are [sic] also kept in residences and buildings. I know that
raptors are transported in vehicles and watercraft. I know that falconers and
videographers will keep equipment in their vehicles, houses and outbuildings.

(Doc. No. 15-1, at 3–4.) He concluded, based on the foregoing, that probable cause existed to

believe that evidence of violations of "TCA 70-4-102 Rules and Regulations 1660-01-02; TCA

70-4-414 Raptors falconry permit Rules and Regulations 1660-01-02" could be found at Lamar's

residence and outbuildings and on her person. (*Id.* at 4.)

On August 3, 2022, defendant Norman and other TWRA officials, apparently including

Boles, authorized by Rider, executed the search warrant at Lamar's property and seized thirteen

live birds, along with electronic equipment and other items. (Doc. No. 1 ¶¶ 54, 55.) The seized

birds included all of Lamar's birds, including birds that Lamar had not listed on her falconry permit

and did not use for falconry purposes, as well as birds that were not native to the United States or

to Tennessee. (*Id.* ¶¶ 56–58.)

The plaintiff alleges that Norman obtained a subsequent search warrant for Lamar's phone

and other electronic devices, which authorized him to search for "any and all electronic data to

GPS positioning, recordings, images, video recordings, audio recordings, and photographs" but did not authorize him to search Lamar's text messages and other communications. (*Id.* ¶¶ 62–64.)[4] Norman nonetheless searched Lamar's phone for personal text messages, which he later used as the basis for at least one criminal charge against Lamar. (*Id.* ¶ 65; *see also* Doc. No. 20-8 (criminal summonses), at 16.) Meanwhile, the seized birds were taken to private facilities that were not equipped to care properly for them and were not legally allowed to hold them, which the defendants knew or should have known. (Doc. No. 1 ¶¶ 67–69.) One of the plaintiff's seized birds subsequently died while it was being held. (*Id.* ¶ 78.) The defendants failed to notify the plaintiff about the death until more than a week later. (*Id* ¶¶ 78–80.)

On November 15, 2022, more than three months after execution of the Search Warrant and while the plaintiff's birds were still in the TWRA's possession, Norman obtained thirty criminal summonses against Lamar, primarily related to the alleged regulatory violations on which the search warrant was premised. (*Id.* ¶ 76; *see also* Doc. No. 20-8.)[5]

Following the death of Lamar's bird, the General Sessions judge to whom the plaintiff's criminal case was assigned *sua sponte* ordered the TWRA to return to the plaintiff five surviving birds pending resolution of the case. (*Id.* ¶ 82.)

Following a hearing on January 9, 2023 at which Boles and Norman testified, the General Sessions judge granted Lamar's motion to suppress and ordered the immediate return of all seized property, including the seized birds. Two weeks later, the state of Tennessee issued a *nolle prosequi* for all criminal charges against Lamar, resulting in the dismissal of the case against her

---

[4] Neither party has filed a copy of this second Search Warrant.

[5] All of these were for Class B or Class A misdemeanors. Eight were for "Raptor possession over the limit (max 5)," and a large number of the remaining charges were for failure to report the transfer of possession of raptors to the state of Tennessee within five days of the change and failure to provide documentation of those transfers to the state. (*See* Doc. No. 20-8.)

in its entirety. (*Id.* ¶¶ 83–85.)

Lamar alleges that she has suffered significant financial injury as well as mental and emotional damages resulting from the seizure of the birds, the criminal charges, the death of one of her birds, the mistreatment of all of her birds, the loss of her business, and the loss of her reputation and standing in the falconry community. In addition, the surviving birds suffered harm from the seizure, resulting in a diminution of their value and future performance.

Based on their actions as alleged in the Complaint, the plaintiff now brings claims under 42 U.S.C. § 1983 against Boles, Norman, and Rider in their individual capacity for (1) unlawful search and seizure in violation of her rights under the Fourth and Fourteenth Amendments to the United States Constitution; (2) violation of her right to substantive due process, protected by the Fourteenth Amendment; (3) false arrest, in violation of her rights under the Fourth and Fourteenth Amendments; (4) malicious prosecution, also in violation of the Fourth and Fourteenth Amendments; (5) retaliation for engaging in rights protected by the First Amendment; and (6) gender discrimination or, alternatively, "class of one" discrimination, in violation of the Equal Protection Clause of the Fourteenth Amendment (asserted against Boles and Norman only).[6]

## II.  THE DEFENDANTS' MOTION

The defendants filed their Motion to Dismiss along with an accompanying Memorandum of Law (Doc. No. 15) and several exhibits, all of which are referenced in the Complaint, including

---

[6] The Complaint also claims that the defendants engaged in a civil conspiracy to deprive her of her constitutional rights. In her Response to the Motion to Dismiss, the plaintiff concedes that the civil conspiracy claim must be dismissed, based on the Sixth Circuit's application of the intracorporate conspiracy doctrine to actions under § 1983, in *Jackson v. City of Cleveland*, 925 F.3d 793, 818 (6th Cir. 2019). (*See* Doc. No. 20, at 32–33.) She states that she nonetheless "raises and preserves this issue for future appellate review." (*Id.* at 33.) In light of the plaintiff's having conceded the issue, however, the court will grant the motion to dismiss this claim without further discussion.

copies of (1) the Search Warrant (Doc. No. 15-1); (2) the list of birds and permits that Lamar provided to Boles (Doc. No. 15-2); (3) the plaintiff's U.S Fish and Wildlife Service permit for Special Purpose – Abatement Using Raptors (Doc. No. 15-3); and (4) a Form 3-186A documenting a transfer of the plaintiff's Barn Owl dated May 31, 2022 (Doc. No. 15-4).[7]

The defendants seek dismissal of all claims set forth in the Complaint under Rule 12(b)(6), for failure to state a claim for which relief may be granted. Regarding the search and seizure claim, they argue that the plaintiff cannot show that the search warrant affidavit contained materially false statements or omissions that would have affected whether the neutral magistrate signed the warrant and that the search warrant, on its face, established probable cause for the search.

The defendants argue that the substantive due process claim must be dismissed, because, even accepted as true, the plaintiff's allegations do not show that the defendants' activities deprived the plaintiff of a particular constitutional guarantee, were conscience-shocking, or were not rationally related to a legitimate state interest.

The defendants contend that the malicious prosecution claim must be dismissed, because the plaintiff does not allege facts showing that any of the defendants made, influenced, or participated in the decision to prosecute her or that she suffered any deprivation of her liberty apart from the initial seizure. They assert that the false arrest claim fails out of the gate, because the plaintiff does not allege that she was ever actually arrested. Alternatively, they argue that, if even one of the thirty charges against her was supported by probable cause, which, they say, the plaintiff

---

[7] The parties do not discuss the contents of this form, but it is curious insofar as it appears to document the transfer of the Barn Owl on that date from Lamar to herself—essentially moving it from her federal "abatement" permit to her falconry permit—and characterizes the transfer as a "loan." (Doc. No. 15-4.) In other words, it does not document the original transfer of the Barn Owl to the plaintiff from a third party, nor does it indicate that the bird was transferred across state lines.

"all but admits," then the false arrest claim must fail. They also assert that the claim must be dismissed as to Boles and Rider, as neither was alleged to have been involved in creating or filing the criminal summonses.

The defendants seek dismissal of the First Amendment retaliation and Equal Protection claims, because, they claim, the plaintiff cannot establish an absence of probable cause and, therefore, cannot show a causal connection between protected activity and an adverse state action.

Alternatively, the defendants argue that the Complaint does not allege that defendant Rider took any particular action against the plaintiff and that all claims against him individually must be dismissed.

Finally, they argue that they are entitled to qualified immunity as to all claims against them, because the plaintiff cannot establish the violation of any clearly established right.

The plaintiff filed a Response to the Motion to Dismiss, along with additional exhibits, including numerous filings relating to her state court motion to suppress the evidence obtained from the search warrant (her motion, the state's response, her reply brief, an amicus brief from the North American Falconers Association, a transcript of the hearing on the motion to suppress, and the order granting it), as well as an email from Captain Cook to an officer with the U.S. Fish and Wildlife Service, copied to Lamar and others including Rider, and copies of the thirty criminal summonses issued against her. (Doc. Nos. 20, 20-1 through 20-8.) The defendants filed a Reply (Doc. No. 23) and then a Supplement to their Reply (Doc. No. 24), to the latter of which is attached a copy of what the defendants claim is the "previous" regulatory definition of "raptor" but which is, in fact the version of the regulation that took effect in August 2021 (which, based on the court's research, appears to be the most recent version) (Doc. No. 24-1). The defendants argue that the "old" and "new" versions of the definition are the same. The plaintiff, with permission, filed a

Surreply (Doc. No. 27) showing that they are incorrect.

### III.    LEGAL STANDARD – RULE 12(b)(6)

Rule 12 permits dismissal of a lawsuit, or claims within a lawsuit, for failure to state a claim upon which relief could be granted. Fed. R. Civ. P. 12(b)(6). While a court deciding a Rule 12(b)(6) motion to dismiss must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff," *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016), the court "may reject 'mere assertions and unsupported or unsupportable conclusions.'" *United States v. Wal-Mart Stores E., LP*, 858 F. App'x 876, 878 (6th Cir. 2021) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006)). The court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The complaint's allegations, that is, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action" but, instead, must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678–79. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, in reviewing a Rule 12(b)(6) motion, the court may, without converting the motion, consider any exhibits attached to the complaint, as well as "public records, items appearing in the

record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). Consideration of extrinsic materials need not convert a motion to dismiss into a motion for summary judgment, "so long as [the materials] are referred to in the complaint and are central to the claims contained therein." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (quoting *Bassett*, 528 F.3d at 430); *see also* 5B Charles Alan Wright & Arthur R. Miller, Fed. Practice & Procedure § 1357 (3d ed. updated Apr. 2022) ("Numerous cases . . . have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned . . . without converting the motion into one for summary judgment.").

## IV.    CONSIDERATION OF DOCUMENTS OUTSIDE THE PLEADINGS

As noted above, both parties have filed numerous exhibits in connection with the defendants' Motion to Dismiss. As set forth above, Rule 12 provides that, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Although the parties do not discuss the matter, the court must determine which documents it may properly consider for purposes of ruling on the Motion to Dismiss.

All of the documents attached to the defendants' motion are clearly referenced in the Complaint and integral to Lamar's claims, including in particular the Search Warrant and the list of birds that Lamar provided to Boles and that allegedly provided most of the probable cause for the Search Warrant (*see, e.g.*, Doc. No. 1 ¶¶ 50–53, 58, 97–114 (referencing the Search Warrant)); *id.* ¶¶ 36, 37, 50, 99 (referencing Lamar's list of birds)), but also including the plaintiff's Federal

Abatement Permit and the Form 3-186A (*see id.* ¶¶ 53, 99(d), 99(e)). The Criminal Summonses, attached to the plaintiff's Response, are repeatedly referenced in the Complaint (*id.* ¶¶ 76, 150–52) and are central to the false arrest and malicious prosecution claims. The Complaint also incorporates by reference the February 19, 2021 email from Walter Cook, which is attached to Lamar's Response, in support of her arguments regarding the TWRA's understanding of its own regulations. (*See id.* ¶ 14.) The court may consider all of these documents without converting the motion into a summary judgment motion.

The court clearly may take judicial notice of the fact that the General Session Court granted the plaintiff's Motion to Suppress filed in that court. In addition, the parties' briefing and the amicus brief related to that motion likely qualify as public records. These documents, however, were not attached to the plaintiff's Response to the Motion to Dismiss for the purpose of establishing disputed facts so much as to incorporate or reiterate legal arguments the plaintiff makes here and to substantiate the legitimacy of her proposed interpretation of the governing regulations. The undersigned finds these documents to have essentially no bearing on any facts at issue here and declines to consider them.

## V.     DISCUSSION

### A.     Section 1983 and Qualified Immunity

Under 42 U.S.C. § 1983, a plaintiff may bring suit against any person who, acting under color of law, violated her constitutional rights. While this statute is straightforward enough, the doctrine of qualified immunity significantly limits the ability of those individuals whose rights may have been violated to actually vindicate those violations.

Under the doctrine of qualified immunity, a government official "will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." *Hicks v. Scott*, 958 F.3d 421, 433 (6th Cir. 2020) (quoting *Butz v. Economou*, 438 U.S. 478, 507 (1978)). Thus, for example,

"[a]n officer conducting a search is entitled to qualified immunity if 'a reasonable officer could have believed' that the search was lawful 'in light of clearly established law and the information the searching officer[] possessed.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 566 (2004) (Kennedy, J., dissenting). This is an objective standard. *See Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) ("Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts. And reasonableness of official action, in turn, must be assessed in light of the legal rules that were clearly established at the time [the action] was taken. This requirement—that an official loses qualified immunity only for violating clearly established law—protects officials accused of violating extremely abstract rights." (internal quotation marks and citations omitted)). In other words, qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

As the Supreme Court has explained, qualified immunity seeks to strike a balance between, on the one hand, the individual citizen's interest in the "vindication of constitutional guarantees," *Ziglar*, 582 U.S. at 150, and, on the other, "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Consequently, the doctrine gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ziglar*, 582 U.S. at 150–51 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)). Thus, for example, although the Fourth Amendment clearly prohibits unreasonable searches and seizures, "it may be difficult for an officer to know whether a search or seizure will be deemed reasonable given the precise situation encountered." *Id.* at 151; *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("It is sometimes difficult for an officer to determine how the relevant

legal doctrine . . . will apply to the factual situation the officer confronts"). The dispositive question is therefore "whether the violative nature of *particular* conduct is clearly established." *Ziglar*, 582 U.S. at 151 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (*per curiam*).

The question of whether the unlawfulness of some particular action is "clearly established" is not always easy to discern. While it is not necessary for the precise action in question to have been held unlawful, such that "an officer might lose qualified immunity even if there is no reported case 'directly on point,'" the unlawfulness of the officer's conduct "must be apparent" "in the light of pre-existing law." *Id.* (citations omitted). As the Supreme Court has further explained,

> [t]o subject officers to any broader liability would be to disrupt the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties. For then, both as a practical and legal matter, it would be difficult for officials reasonably [to] anticipate when their conduct may give rise to liability for damages.
>
> In light of these concerns, the Court has held that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. To determine whether a given officer falls into either of those two categories, a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted. If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however—*i.e.*, if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

*Id.* at 151–52.

To survive a motion to dismiss on qualified-immunity grounds, a complaint must allege facts that "plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). The Complaint must allege with particularity "facts that demonstrate what each defendant did to violate the asserted constitutional right." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011)). The

plaintiff bears the ultimate burden of showing that the defendants are not entitled to qualified immunity. *Id.* However, while qualified immunity questions should be answered at the earliest possible stage of litigation, the Sixth Circuit has cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015).

Consideration of a qualified immunity claim requires the court to determine (1) whether the facts alleged make out a violation of a constitutional right and (2) whether "the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Courtright*, 839 F.3d at 518 (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). These questions may be answered in any order, but "both must be answered in the affirmative for the plaintiff's claim to proceed." *Id.* (quoting *Martin*, 712 F.3d at 957).

### B.    Count One: Unlawful Search and Seizure

#### 1.    The Five Bird Limit

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Absent circumstances not present here, a search of a person's home will be unreasonable unless it is supported by a search warrant, and a search warrant may properly be issued under the Fourth Amendment only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the . . . things to be seized." *Id.* "Probable cause exists if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Tlapanco v. Elges,* 969 F.3d 638, 648 (6th Cir. 2020) (citation and internal quotation marks omitted)

Generally, "[p]olice officers are entitled to rely on a judicially secured warrant for immunity from a § 1983 action for illegal search and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable." *Marvaso v. Sanchez*, 971 F.3d 599, 610 (6th Cir. 2020) (quoting *Yancey v. Carroll Cty.,* 876 F.2d 1238, 1243 (6th Cir. 1989)). A neutral magistrate's issuance of a warrant is considered "the clearest indication that the officers acted in an objectively reasonable manner or, as [the Supreme Court has] sometimes put it, in 'objective good faith.'" *Id.* (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). Thus, ordinarily, "an officer cannot be expected to question the magistrate's probable-cause determination," because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *United States v. Leon*, 468 U.S. 897, 921 (1984).

That said, even when a magistrate judge has made such a probable cause determination, it is well established that "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge." *Yancey*, 876 F.2d at 1243. At the same time, if probable cause is still present, despite the false statements, no Fourth Amendment violation occurs. *See id.*

Lamar's Fourth Amendment claim in Count One of the Complaint is premised in part on the existence of false statements in the Search Warrant affidavit pertaining to the number of birds she possessed, without which, she contends, the warrant would not have issued. More specifically, Lamar alleges that:

(1) the statement that the plaintiff was subject to a "legal limit" of five raptors under Tenn. Comp. R. & Regs 1660-01-02-.03 was false, because the regulation establishes only the number of raptors a person can possess "for the purpose of falconry," and the affidavit did not explain that the regulation does not set an

absolute limit on the number of raptors a person may possess outside that usage or allege that Lamar was using more than five birds for falconry purposes;

(2) the statement that the plaintiff "admitted" to possessing "approximately 11 raptors" in the list of birds she sent to Boles was false, because the affidavit failed to explain that only four of the birds on the list were raptors native to Tennessee and counted toward the five-bird limit, as non-native birds fall outside TWRA's jurisdiction and do not require permits, and birds classified as "Class III wildlife" are not subject to Tennessee's falconry regulation under Tenn. Code Ann. § 70-4-403(a); and

(3) the affidavit falsely stated that the plaintiff "admitted" to possessing eleven "raptors" when, in fact, she did not admit anything but simply provided a list of birds to Boles, and the affidavit also omitted the fact that Boles had repeatedly referred Lamar to the outdated definition of "raptor" found in the 2018 version of the regulation posted on TWRA's website.[8]

The plaintiff states that the defendants knew or should have known that these statements were false or materially incomplete and, as a result, that the Search Warrant was not supported by probable cause to believe that Lamar had committed any criminal offense related to the possession of more than five raptors. (*Id.* ¶ 100.) She alleges that she repeatedly explained the regulations to Boles and Rider, that other knowledgeable people had corroborated her view, and that "[n]o reasonable officer" would have believed that her conduct was illegal. (*Id.* ¶¶ 101, 103.) In addition, she alleges that "[a]ny reasonable officer" would have consulted with legal counsel on the proper interpretation of the regulations before obtaining the Search Warrant and seizing the plaintiff's birds. (*Id.* ¶ 104.) She also alleges that Norman worked under Captain Cook, was aware of Cook's interpretation of the regulations, was present for the inspection of Lamar's aviary that took place in connection with her obtaining her master falconry license, and personally knew or should have known that there was no lawful basis for seizing Lamar's birds or other property. (*Id.* ¶ 107.)

In support of their Motion to Dismiss, the defendants address each of these allegedly false

---

[8] For example, it seems that neither the Barn Owl nor the various "falcons" on the plaintiff's list of birds qualified as "raptors" under the definition in the 2018 regulation.

statements. Regarding the first—that it was illegal for the plaintiff to possess more than five raptors—the defendants point out that the regulation in question contains this language: "A master permittee may not possess more than five raptors, and may not obtain more than two raptors taken from the wild for replacement birds during any twelve-month period." Tenn. Comp. R. & Regs. 1660-01-02-.03(7)(c)(2). This is the second "condition" for holding a master falconer permit. *Id.* Although the plaintiff contends that this limitation only pertains to how many raptors a licensee may possess for falconry purposes (with "falconry" defined by the regulation as "the sport of taking quarry by means of a trained raptor," *id.* at 1660-01-02-.03(1)(c)), the defendants argue that this is simply her interpretation and that the statement contained in the Search Warrant affidavit is consistent with the regulation as written and not objectively false. They further argue that, even if the plaintiff is correct that they misinterpreted the regulations, they are entitled to qualified immunity for such mistakes of law. (Doc. No. 15, at 23.)

In her response, the plaintiff goes to great lengths to explain the interplay between federal and state law, the different types of permits issued for different activities involving migratory birds of prey that are native to the United States (of which falconry is only one, along with nuisance abatement, propagation, and education), and why any reasoned construction of subparagraph (7)(c)(2) of the above-referenced regulation leads inevitably to the conclusion that a master falconer may possess no more than five "raptors" *used for falconry* but, further, that the regulation does not govern or limit the number of raptors *not* used for falconry that a person may possess. (Doc. No. 20, at 2–5.) She further points out that the Search Warrant nowhere alleges that she was engaging in falconry with more than five raptors.

Notably, the plaintiff does not point to any caselaw construing the Tennessee regulations (or any other state's similar regulations) governing the possession of raptors or the interplay

between the regulations permitting possession of raptors for falconry purposes as opposed to other purposes, including nuisance abatement, education, and propagation. While the plaintiff's construction of the regulations may be correct—and, for purposes of the defendants' Motion to Dismiss, the court presumes that it is—the defendants' reading of the regulation to mean what it states on its face was not objectively unreasonable. This is precisely the type of mistake of law to which qualified immunity applies: there was no "pre-existing law" to shed light on the proper interpretation of the regulations, such that "it would have been clear to a reasonable officer" that a master falconer was entitled to possess more than five raptors for any purpose or, therefore, that the search based on the information in the TWRA's possess was unlawful. *Ziglar*, 582 U.S at 151, 152. That is, given the state of the law and the indisputably ambiguous and confusing patchwork of statutes and regulations, it is clear to the court that "a reasonable officer might not have known for certain that [the TWRA's] conduct was unlawful." *Id.* at 152.

For the same reason, the statement in the Search Warrant affidavit that the plaintiff's list of birds amounted to an "admission" that she possessed more than five raptors was not objectively unreasonable, based on the plain language of the regulation and the plaintiff's list of birds that apparently fell within that 2021 regulatory definition of "raptor," regardless of whether she was using the birds for falconry *per se* or only for falconry education. The fact that she did not refer to them as "raptors" is immaterial to the question of whether they were, in fact, raptors (or, at any rate, immaterial to the question of whether the TWRA officers reasonably believed that they qualified as "raptors"). And, while it is unfortunate that the TWRA's website was not updated with the current and correct version of the regulation, that failure is likewise immaterial to the question

of whether, in fact, Lamar possessed more than five raptors under the applicable regulation.[9]

The plaintiff also argues that the statement that she admitted to possessing eleven raptors on the list she sent to Boles was factually false, because it failed to recognize that only four of the birds on the list were native to Tennessee[10] and, as such, subject to the jurisdiction of the TWRA, unless they were actually being used for falconry (which the plaintiff denies).[11] The court, again, presumes that the plaintiff's interpretation of the governing statute to be correct. As she argues, Tennessee statute defines "Class II" animals as all native species except those listed in other classes, while "non-native" birds are statutorily grouped within "Class III," as "[a]vian species not otherwise listed"—a class of animal the possession of which requires no permit "except those required by the department of agriculture." Tenn. Code Ann. § 70-4-403(2) & (3)(F). The plaintiff insists that the regulatory definition of raptor, therefore, does not include non-native birds *unless* they are actually being used for falconry as defined by the regulation (thus requiring permitting), even though the regulatory definition of "raptor" on its face appears to include *all* species of "live migratory bird of . . . the family Falconiformes"—presumably falcons—and "the family Strigidae"—owls—regardless of their status as native or non-native. *See* Tenn. Comp. R. & Regs. 1660-01-02-.03(1)(a).

Again, however, while the court finds that the TWRA officers were likely mistaken in their

---

[9] The plaintiff does not allege that the failure to update TWRA's website amounts to anything other than negligence. And, while she claims Boles should have known that she was relying on the language of the outdated regulation, she does not allege facts from which it might be inferred that Boles was intentionally misleading her or that he had actual knowledge that the TWRA's website had not been updated.

[10] She does not identify which four.

[11] The list of birds shows that plaintiff identified five birds—all peregrine falcons—as on her Tennessee "falconry" permit, but three of those birds were still in Canada awaiting an import permit and had never been in Tennessee. (Doc. No. 15-2.) The other birds were identified as being on her federal propagation, abatement, or falconry school permits. (*Id.*)

understanding of the law (as was, apparently, the magistrate to whom the Search Warrant affidavit and Search Warrant were presented and as their current counsel continue to be[12]), the officers' focus on the regulatory definition to conclude that the birds in the plaintiff's possession qualified as "raptors" was not objectively unreasonable, in light of the complexity of the law and the utter dearth of guidance from the Tennessee courts as to how to construe the web of statutes and regulations governing the possession and use of birds of prey.

In sum, insofar as the Search Warrant was premised upon the statements in the first of the two paragraphs in Norman's affidavit setting forth the "probable cause" basis for the warrant, the court cannot find that the officers' reliance on the statements in that paragraph was objectively unreasonable. The Supreme Court, moreover, has repeatedly explained that probable cause exists when the available facts would "warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotation marks and citations omitted). All that is required is "the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Id.* at 244 (internal quotation marks and citations omitted). The Sixth Circuit has recognized that "the ultimate question of probable cause (separate from the determination of historical facts) in a civil case when the historical facts are undisputed is a question of law for the court and not a jury." *Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020).

---

[12] As just an example, the court observes that the defendants' assertion in their Reply that "all raptors are 'native'" because they are "migratory" and thus "might be found in Tennessee" as they migrate (Doc. No. 23, at 2) is truly absurd, as there are certainly species of migratory birds of prey (that fall within the definition of "raptor" in Tenn. Comp. R. and Regs. 1660-01-02-.03(1)(a)), both within and outside the United States, whose patterns of migration never extend through Tennessee.

In reaching a conclusion that probable cause existed here as a matter of law, even if the defendants were ultimately incorrect in their interpretation of the law, the court accepts as true the plaintiff's allegations that she tried to inform Boles as to the proper interpretation of the law and that he was admittedly confused about it, as well as her allegations that Boles' predecessor interpreted the law differently than Boles did and that Boles told her he planned to consult with the U.S. Fish and Wildlife Service and the TWRA's legal counsel before taking action against her. In other words, the court resolves all potential factual disputes in the plaintiff's favor at this juncture. Clearly, Boles, as the officer charged with enforcing TWRA's regulations, could have done more to understand those regulations before taking action, based on the plaintiff's version of events. But the court is charged with asking whether a TWRA officer who knew that Lamar was a master falconer and in possession of more than five birds that met the regulatory definition of "raptor" would be objectively reasonable in believing that she was in violation of the regulation that states, "A master permittee may not possess more than five raptors." On these undisputed facts, the court finds Boles and the other defendants were in possession of information sufficient to "warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Harris*, 568 U.S. at 243.[13]

Finding that the first "Probable Cause" paragraph of Norman's affidavit was sufficient to establish probable cause to support the Search Warrant, the court does not reach the plaintiff's (very compelling) arguments about the objective failure of the second paragraph to provide probable cause to justify the search.

---

[13] The wisdom of executing the Search Warrant and seizing the plaintiff's birds is a wholly different question. The record does not reveal exigent circumstances that required TWRA to pursue that course of action, as opposed to simply issuing citations, assessing a fine, and working with Lamar to transfer some of her birds to other suitable homes—or, in any event, pursuing some other, more humane and rational approach.

## 2. Adequate Nexus

The plaintiff further alleges that the defendants knew or should have known that the Search Warrant was facially defective, because it did not provide a sufficient nexus between the "alleged crimes and the property to be searched." (Doc. No. 1 ¶ 108.) The defendants do not address the plaintiff's nexus allegations in their Memorandum in support of the Motion to Dismiss, which the plaintiff points out in her Response. (Doc. No. 20, at 15.) The discussion of the issue contained in their Reply is perfunctory at best.

The affidavit in this case appears to allege three regulatory violations: possession of more than the five "raptors" permitted by regulation, failure to timely report a transfer of possession of the Barn Owl, and failure to have a Tennessee Animal Damage Control Permit. (Doc. No. 15-1, at 3.) Based on these suspected offenses, the affidavit requests authorization to search and seize

> 1. Photographs; video recordings; electronic media storage devices; cameras; trail cameras; video cameras; computer hard drives; computers; cellular telephones which may contain telephone numbers, text messages, videos, photographs, internet activity, location data and uploads to social media; handwritten notes; maps; and any other item which tends to memorialize the illegal taking or possession of raptors[;]
>
> 2. Live raptors and raptor parts or meat possessed by Mary Holladay Lamar[;]
>
> 3. Permits both Federal and State, raptor regulations, or correspondence with agencies that regulate raptors[; and]
>
> 4. Equipment used to trap live raptors used by Mary Holladay Lamar.

(Doc. No. 15-1, at 2.)

Generally, to establish probable cause, "[t]here must . . . be a 'nexus between the place to be searched and the evidence sought." *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) (citations omitted). Here, the affidavit stated that the place to be searched was Lamar's residence and property, including outbuildings where she kept the birds in question, and her papers and electronic equipment. The affidavit clearly established an adequate nexus between Lamar's

residence and her alleged offense of being in possession of too many birds. Moreover, it was not unreasonable for the officers to expect evidence memorializing her possession of various birds to be maintained on her cell phone and other electronic equipment.

### 3. Staleness

The plaintiff asserts that reliance on the Search Warrant was objectively unreasonable, because the "factual basis" for purported probable cause was "stale," having come from the list of birds the plaintiff provided to Boles more than two months before the Search Warrant was executed. (*See* Doc. No. 1 ¶ 108.)

Factors courts are to consider in making a staleness determination include: "(1) whether the character of the crime is a chance encounter or continuous in nature; (2) whether the suspected criminal is nomadic or entrenched; (3) whether the evidence to be seized is perishable or enduring; and (4) whether the place to be searched is a mere forum of convenience or secure operational base." *United States v. Hampton*, 760 F. App'x 399, 402 (6th Cir. 2019) (citing *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)).

Notably, most of the cases the plaintiff cites in support of her staleness argument involved drug dealing. *See, e.g.*, *United States v. Perry*, 864 F.3d 412, 414 (6th Cir. 2017); *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (noting drug crime information usually goes stale "very quicky because drugs are usually sold and consumed in a prompt fashion"); *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001). Particularly in light of federal and state requirements pertaining to the documentation of the transfer of possession of "raptors," it was not inherently unreasonable for the defendants to believe that the plaintiff's possession of birds would be relatively stable over the course of a few months.

In *Hampton*, a gap of at least four months between the time firearms were reported to have been seen and the issuance of a search warrant for firearms at the home of a previously convicted

felon was deemed not to be "stale" evidence. Similarly here, the magistrate who issued the Search Warrant did not abuse his discretion in inferring from the reference to the list of birds Lamar provided to Boles in May that "evidence of wrongdoing" would still be present at her home in August, over two months later. Lamar's possession of birds of prey was clearly continuous in nature; she was not "nomadic"; the birds themselves were not quickly "perishable"; and her home qualified as a "secure operational base," rather than a forum of convenience. The information supporting the Search Warrant was not stale.

### 4. The Search of Lamar's Cell Phone Text Messages

The plaintiff alleges that, aside from the initial search and seizure, defendant Norman later obtained a second search warrant to search her cell phone; that this search warrant authorized a search for "any and all electronic data to GPS positioning, recordings, images, video recordings, audio recordings, and photographs" but did not authorize a search of personal text messages; and that Norman nonetheless "searched, or caused to be searched, Plaintiff's phone for her personal text messages, which he later used as the basis for at least one criminal charge against her." (Doc. No. 1 ¶¶ 62–65; *see also id.* ¶ 113.) The plaintiff asserts that the unauthorized search of her text messages constituted a separate Fourth Amendment violation.

Regarding this claim, the defendants argue that "courts have held that a second warrant is not necessary 'where the evidence obtained in the search did not exceed the probable cause articulated in the original warrant.'" (Doc. No. 15, at 10 (quoting *United States v. Richards*, 659 F.3d 527, 529 (6th Cir. 2011)).) The Search Warrant authorized the search of, among other things, "cellular telephones which may contain *. . . text messages . . .* ; and any other item which tends to memorialize the illegal taking or possession of raptors." (Doc. No. 15-1, at 1, 2.) The second Search Warrant is not in the record, and the Complaint contains no additional allegations regarding the probable cause provided in support of the second warrant. Regardless, the first Search Warrant

expressly provided for the seizure of cellular phones on the basis that they were likely to contain communications relating to the possession of raptors. On its face, the Complaint fails to state a separate Fourth Amendment claim based on the search of the plaintiff's cell phone text messages, insofar as this search fell within the permissible scope of the first Search Warrant.

### 5. Seizure of All Thirteen Birds

Finally, within the rubric of her "nexus" argument, the plaintiff asserts that the most obviously excessive and overly broad seizure authorized by the Search Warrant was the seizure of all thirteen of her birds, even though the Search Warrant affidavit itself acknowledged that she was authorized to possess up to five "raptors." (*See* Doc. No. 1 ¶ 112.) The defendants' Motion to Dismiss, remarkably, does not address this allegation. In her Response, Lamar argues that "[e]ven the Defendants' flawed interpretation of the law concedes that Ms. Lamar was allowed at least five birds, yet they obtained a search warrant to take all of them," without justification. (Doc. No. 20, at 15–16.) The defendants' Reply does not address this argument. Even in their discussion of qualified immunity, the defendants acknowledge that "state law at the time that Plaintiff provided her list of birds to the Defendants was that she could only hold five raptors." (Doc. No. 15, at 22.)

Given that the statement of probable cause in support of the Search Warrant states that Lamar, as a master falconer, was legally permitted to possess five raptors and that the Search Warrant provides no basis for any other charges related to the possession of those raptors (one of which was the supposedly undocumented Barn Owl), no reasonable officer would have believed from the face of the Search Warrant and affidavit that the seizure of all thirteen birds was permissible or reasonable. The court, therefore, finds that Lamar has stated a Fourth Amendment claim based on the unreasonableness of the defendants' seizure of all thirteen of her birds and that the defendants are not entitled to qualified immunity as to this subclaim.

This claim, moreover, is stated against all three defendants. Norman and Boles are alleged to have been directly involved in obtaining the Search Warrant: "Defendant Norman obtained a search warrant to search and seize Plaintiff Lamar's property at the direction of and in collaboration with defendant Boles." (Doc. No. 1 ¶ 49.) And Lamar further alleges, based on Norman's affirmation, that Rider, as their "superior officer" and the head of TWRA's "Law Enforcement Division," "authorized" the Search Warrant. (*Id.* ¶¶ 6, 45, 55, 142.) Under Sixth Circuit law, a plaintiff states a claim for individual liability under § 1983 against a supervisory officer when she alleges facts from which it may be inferred that the supervisor "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Coley v. Lucas Cty.*, 799 F.3d 530, 542 (6th Cir. 2015) (citation omitted).

> 6. *Summary*

While the court finds that, at a minimum, the defendants reasonably believed that probable cause existed to support the Search Warrant executed at Lamar's property on August 3, 2022 and that they are entitled to qualified immunity with respect to many of the claims encompassed within the plaintiff's Fourth Amendment claim in Count I of the Complaint, she has adequately alleged that the decision to seize, and the actual seizure of, all thirteen of her birds was objectively unreasonable and that no reasonable TWRA officer in possession of the same information as Boles, Norman, and Rider would have believed that this seizure was authorized or legal. The court will grant in part the Motion to Dismiss Count I but deny it as to this part of the plaintiff's claim.

## C. Count Three: False Arrest

To be clear, Lamar was not arrested at the time her home and property were searched and seized. Instead, as she articulates in the Complaint, the defendants waited an additional three months before filing thirty criminal summonses against her. As previously noted, the charges were primarily, but not exclusively, premised on the same alleged regulatory violations on which the

search warrant was premised.

In support of her false arrest claim, Lamar alleges that "Defendant Norman—at the direction of Defendant Boles and with agreement by Defendant Rider—obtained 30 criminal summonses against [her], all of which lacked probable cause." (Doc. No. 1 ¶ 151.) Issuance of the summonses "compelled" her to go to the police station attached to the jail to receive the charges, to "an office run by the Sheriff's Department to be 'booked,' and to court." (*Id.* ¶ 152.) She asserts that, even if some of the charges may have been supported by probable cause (but without conceding as much), any additional charges that were unsupported by probable cause caused her to incur additional attorneys' fees, emotional harm, and other damages.

Among other arguments, the defendants assert that the plaintiff cannot show that she was actually "arrested" for purposes of a false arrest claim (Doc. No. 15, at 15) and that they are entitled to qualified immunity in any event, not having violated any of the plaintiff's clearly established rights.

To withstand a motion to dismiss a false arrest claim, the plaintiff must plausibly allege that she was arrested and that the arrest was "unsupported by probable cause." *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015); *see also Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022) ("To succeed on a false arrest claim, a plaintiff must establish (1) a lack of probable cause and (2) an arrest."); *Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020) ("To prevail on a false arrest claim under § 1983, 'a plaintiff [must] prove that the arresting officer lacked probable cause to arrest the plaintiff.'" (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)).

"An arrest—the quintessential seizure of a person—occurs when the government applies physical force to seize a person or asserts lawful authority to which the subject accedes." *Richmond*, 47 F.4th at 1180 (citing *California v. Hodari D.*, 499 U.S. 621, 624, 626–27 (1991)).

The defendants assert that Lamar was never "arrested," because, under Tennessee law, "officers normally do not arrest on the basis of a criminal summons but rather issue a citation and direct the defendant to appear at some time to answer the charges." (Doc. No. 15, at 14 (citing *Terry v. Jefferson Cty.*, No. 3:13-CV-368, 2015 WL 621561, at * 1 (E.D. Tenn. Feb. 12, 2015); Tenn. Code Ann. § 40-6-215(a)(1) and (b)).) In response, Lamar here effectively concedes that she "may not have been 'arrested' as defined under Tennessee law," and she does not address the question under federal Fourth Amendment law, except to assert that there is "little difference between being physically transported to jail for booking and being commanded to report to the sheriff's office for booking upon threat of an arrest for a new, separate offense." (Doc. No. 20, at 30.)

The Sixth Circuit does not appear to have addressed this question, but Supreme Court precedent at least "suggests that voluntary surrender to an arrest warrant constitutes a seizure under the Fourth Amendment." *McLin v. Ard*, 866 F.3d 782, 292 (5th Cir. 2017) (citing Chief Justice Rehnquist's plurality opinion in *Albright v. Oliver*, 510 U.S. 266, 271, 276 (1994), as observing that, although he did not claim a Fourth Amendment violation, the plaintiff's "surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment," and Justice Ginsberg's concurring opinion as stating that the plaintiff's "submission to arrest unquestionably constituted a seizure for purposes of the Fourth Amendment"). In *McLin*, the plaintiff alleged that several police officers prevailed on city council members to falsely "sw[ear] out criminal complaints" against the plaintiff, contending that they were subjected to "criminal defamation as a result of comments [the plaintiff] posted on Facebook," as a result of which, the defendants issued three arrests warrants. *McLin*, 866 F.3d at 687. When the plaintiff learned about the arrest warrants, he "voluntarily surrendered at the sheriff's office and signed a misdemeanor summons pertaining to the three purported criminal defamation violations." *Id.* Based largely on *Albright*,

the Fifth Circuit held in *McLin* that the plaintiff before it adequately pleaded that he was "seized under the Fourth Amendment." *Id.* at 694; *accord Goad v. Town of Meeker*, 654 F. App'x 916, 921 (10th Cir. 2016) (despite the plaintiff's admission that he was not arrested, finding that he was "seized" for Fourth Amendment purposes, because, when he learned that a misdemeanor arrest warrant had been issued against him, he "turned himself in to the Lincoln County Jail and was released after booking," thus "surrender[ing] to the State's show of authority" (quoting *Albright*, 510 U.S. at 271)); *Whiting v. Traylor*, 85 F.3d 581, 586 & n.6 (11th Cir. 1996) (holding that the plaintiff's initial voluntary surrender was a seizure because "he subjected himself physically to the force of the state in response to an arrest warrant").

In *McLin*, however, the court also held that the defendants were entitled to qualified immunity from the plaintiff's false arrest claim, because it was not clearly established in the Fifth Circuit at that time that the issuance of criminal summonses, standing alone, could qualify as a Fourth Amendment seizure:

> Here, we cannot say that *every* reasonable officer would understand that McLin was seized under the Fourth Amendment. To date neither the Supreme Court nor the Fifth Circuit has decided that an officer's acceptance of a voluntary surrender to an arrest warrant constitutes a Fourth Amendment seizure. And there is no "robust consensus of persuasive authority": only one circuit—the Eleventh—has found a seizure in these circumstances in a published opinion, and a majority of circuit courts have not yet weighed in. Although we now hold that McLin was seized, reasonable officers might not have understood that accepting McLin's surrender to the arrest warrants, without imposing further pre-trial restrictions, constituted a seizure.

*McLin*, 866 F.3d at 696.[14] Because the plaintiff failed to plead the violation of a "clearly

---

[14] As the court noted in *McLin*, most of the other courts to consider the question have held that the mere issuance of a summons does not constitute a seizure. See *McLin*, 866 F.3d at 693 n.7 (citing *Bielanski v. Cty. of Kane*, 550 F.3d 632, 642 (7th Cir. 2008) ("No court has held that a summons alone constitutes a seizure, and we conclude that a summons alone does not equal a seizure for Fourth Amendment purposes."); *Martinez v. Carr*, 479 F.3d 1292, 1299 (10th Cir. 2007) ("[T]he mere issuance of a citation requiring presence at future legal proceedings does not qualify as a constitutional 'seizure'. . . ."); *DiBella v. Borough*, 407 F.3d 599, 603 (3rd Cir. 2005)

established" constitutional right, the court affirmed the dismissal of the Fourth Amendment claim on the grounds of qualified immunity.

So, too, in this case. There is no controlling opinion from the Sixth Circuit or the Supreme Court on the question of whether a plaintiff's voluntarily surrendering in response to the issuance of a summons constitutes a "seizure" for Fourth Amendment purposes. As set forth above, only a handful of circuit courts have so held, and the majority have held to the contrary. *See* Note 15, *supra*. Thus, even assuming that the plaintiff was seized for Fourth Amendment purposes—and that the defendants lacked probable cause for issuance of *any* of the summonses—the defendants are nonetheless entitled to qualified immunity as to the false arrest claim. As was the case in *McLin*, the court cannot find, based on the absence of controlling law on this topic, that "*every* reasonable officer would understand that [Lamar] was seized for purposes of the Fourth Amendment." *Id.* at 696.

This claim is subject to dismissal on qualified immunity grounds.

### D.    Count Three: Malicious Prosecution

The plaintiff also alleges that she was "maliciously prosecuted" as a result of the thirty criminal summonses issued against her. The facts to support this claim overlap to some extent with those alleged in support of the false arrest claim: as a result of the criminal summonses, Lamar was compelled to go to a police station to receive the charges, be booked, and appear in court.

---

(finding no seizure where plaintiffs were issued summonses, but never were arrested, never posted bail, and never were subject to any travel restrictions or pre-trial reporting requirements); *Karam v. City of Burbank*, 352 F.3d 1188, 1191, 1194 (9th Cir. 2003) (finding no seizure where no arrest warrant issued and "all [plaintiff] had to do was show up for court appearances and obtain permission from the court if she wanted to leave the state"); *Britton v. Maloney*, 196 F.3d 24, 30 (1st Cir. 1999) ("Absent any evidence that Britton was arrested, detained, restricted in his travel, or otherwise subject to a deprivation of liberty before the charges against him were dismissed, the fact that he was given a date to appear in court is insufficient to a establish a seizure within the meaning of the Fourth Amendment.")).

(Doc. No. 1 ¶ 152.) She alleges that she received a favorable termination of all charges when they ended without a conviction upon being dismissed by the state. (*Id.* ¶ 153.)

A malicious prosecution claim under § 1983 is "sometimes referred to as a claim for unreasonable seizure pursuant to legal process." *Thompson v. Clark*, 596 U.S. 36, 42 (2022); *Sykes v. Anderson*, 625 F.3d 294, 310 (6th Cir. 2010) ("A better name that would perhaps grasp the essence of this cause of action under applicable Fourth Amendment principles might be 'unreasonable prosecutorial seizure.'" (citation omitted)). A plaintiff bringing a malicious prosecution claim must show "(1) that a criminal prosecution was initiated against [her] and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, [she] suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding was resolved in [her] favor[.]" *Wright v. City of Euclid*, 962 F.3d 852, 875–76 (6th Cir. 2020) (internal citations and quotation marks omitted). The claim does not require a showing of actual malice. *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017).

The defendants argue here that the plaintiff has not alleged sufficient facts to show either that the defendants "participated in the decision to prosecute" or that the plaintiff suffered a deprivation of liberty required to establish a malicious prosecution claim. In response to the latter argument, the plaintiff cites *Phat's Bar & Grill v. Louisville Jefferson County Metropolitan Government*, 918 F. Supp. 2d 654 (W.D. Ky. 2013), in support of the proposition that "district courts have found a deprivation sufficient to satisfy this malicious prosecution element where the plaintiff was arrested, taken to jail, arraigned, or arrested, booked, and released upon bond after a pretrial hearing" and that at least one district court "found that a plaintiff suffered a Fourth Amendment deprivation of liberty without ever being transported to or booked at the police

station." (Doc. No. 20, at 28 (quoting *Phat's Bar & Grill*, 918 F. Supp. 2d at 663).)

The Sixth Circuit has provided better guidance than suggested by either party. First, in an unreported 2017 opinion, the court held that the plaintiff failed to allege a deprivation of liberty sufficient to state a malicious prosecution claim, even though it was undisputed that "the police called him in for questioning (twice) and he had to undergo a polygraph exam; he had to hire a criminal defense attorney; the court required him to attend a status conference; the police/prosecutor withheld his car from him, in impound, for over five months; and the false charges caused substantial embarrassment, personally and professionally, as he had to reveal this prosecution to his employer; all of which inhibited his practice as a lawyer and cost him thousands of dollars." *Noonan v. Cty. of Oakland*, 683 F. App'x 455 (6th Cir. 2017). The court there found that none of these acts deprived the plaintiff of a liberty interest protected by the Fourth Amendment and that "[s]ervice with a summons to appear at trial or some other court proceeding does not rise to the level of a constitutional deprivation." *Id.* at 463; *see id.* ("Given that a summons to appear is even less a deprivation than an arrest, it stands to reason that it too is insufficient to satisfy this third element of a Fourth Amendment malicious-prosecution claim under § 1983, pursuant to *Sykes*.").

Less than a year later, the plaintiff in *Miller v. Maddox*, 866 F.3d 386 (6th Cir. 2017), brought a malicious prosecution claim. In that case, the defendant police officer, as the complaining witness, filed an affidavit that led a night commissioner to issue a warrant for the plaintiff's arrest. After the plaintiff participated in the video conference with the night commissioner who found probable cause, she remained detained for an additional forty-five minutes and then had to pay "a $35 fee to be released and was required to participate in a pretrial release program, which mandated that she show up on time for all court appearances and call the

pretrial case manager every week until the case was resolved." *Id.* at 383. The court distinguished the facts from those in *Noonan*, where the plaintiff was "never arrested or incarcerated, required to post bail or bond, or subjected to any travel restrictions." *Id.* (quoting *Noonan*, 683 F. App'x at 4620–63). It also noted that it had elsewhere "'assume[d] that' conditions of pretrial release 'represent a sufficient deprivation of . . . liberty to satisfy the third element' of *Sykes*" and had "indicated that imposing restrictions designed to compel court appearance, 'such as obligations to post bond, attend court hearings, and contact pretrial services' could constitute a seizure." *Id.* (quoting *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015), and *Johnson v. City of Cincinnati*, 310 F.3d 484, 493 (6th Cir. 2002)). The court concluded that the facts in that case—that the plaintiff was "required to pay $35 to be accepted into the pretrial program, could have been required to post a $3,000 bond, was required to attend court appearances, and required to check in with a case manager once per week"—"involve[d] precisely the factors that were missing in *Noonan* and that *Johnson v. City of Cincinnati* suggested could constitute a deprivation of liberty apart from the initial seizure." *Id.* In addition, the court found a material question of fact existed as to how long the plaintiff was detained after being accepted into the pretrial release program, and that, "[t]o the extent that [she] was detained for any amount of time after being accepted into the pretrial release program, that portion of her detention prolonged the seizure beyond the point necessary to carry out the seizure's purpose." *Id.* at 394. The court therefore reversed summary judgment for the defendant on the malicious prosecution claim.

Even more recently, the Sixth Circuit has reiterated that "service with a summons to appear at trial or some other court proceeding does not rise to the level of a constitutional deprivation." *Wright*, 962 F.3d at 877 (citing *Noonan*, 683 F. App'x at 463). In *Wright*, however, the plaintiff adequately alleged facts to support a malicious prosecution claim, where he was "confined in the

jail and in the hospital for many hours after the initial seizure but before being released." *Id.*

This case, however, is more like *Noonan* than *Miller* or *Wright*. The Complaint alleges only that Lamar was compelled by the summonses to go to the police station to receive the charges and then to be booked. She does not allege that she was required to post bond or to participate in any type of pretrial release program; nor does she claim to have been subjected to any travel restrictions. While, as set forth above, her initial appearance in response to the criminal summonses might be deemed a "seizure" sufficient to state a false arrest claim, she does not allege any additional deprivation of her liberty apart from that initial seizure.[15] Moreover, the law is clear that the continued detention of her birds, the damage to her reputation, being required to show up for court appearances, suffering financial harm to her business as well as incurring attorney's fees, and mental and emotional harm from the false charges are not the type of deprivations of "liberty" required to support a Fourth Amendment claim. *See Noonan*, 683 F. App'x at 462, 463; *accord Adams v. Lexington-Fayette Cty. Urban Gov't*, 5:22-cv-00241-GFVT, 2023 WL 6205415, at *1 (E.D. Ky. Sept. 22, 2023) ("A plaintiff cannot base a malicious prosecution claim on non-liberty deprivations, including the financial cost from the legal process, a deprivation of property, . . . a detriment to a person's employment and income [or] emotional harm[.]" (internal quotation marks omitted) (collecting cases)).

Because Lamar does not allege that she suffered a deprivation of her liberty apart from the initial seizure and "as a consequence of a legal proceeding," she fails to state a claim for malicious prosecution. The defendants are entitled to dismissal of the malicious prosecution claim asserted

---

[15] In her Response to the Motion to Dismiss, the plaintiff asserts in a footnote that the booking process itself takes time and incorporates waits of up to 30-40 minutes. (Doc. No. 20, at 30 n. (citing the Davidson County Sheriff's Office's website).) These are not facts alleged in the Complaint, however.

in Count III of the Complaint on this basis.

### E. Count Four: First Amendment Retaliation

To establish a First Amendment retaliation claim, a plaintiff must prove that: (1) she engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that type of conduct; and (3) that this adverse action was taken at least in part because of the exercise of the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). The Supreme Court has held that, as with retaliatory prosecution claims, "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett* 139 S. Ct. 1715, 1724 (2019). It has also emphasized that the inquiry is objective. *See id.* at 1725 ("[W]hen reviewing an arrest, we ask whether the circumstances, viewed objectively, justify [the challenged] action, and if so, conclude that action was reasonable whatever the subjective intent motivating the relevant officials." (internal quotation marks and citations omitted)).

The defendants argue that the First Amendment retaliation claim should be dismissed because they, at the very least, reasonably believed that the plaintiff was in violation of the governing regulations by possessing more than five "raptors." And, as set forth above, the court has found that Boles and Norman reasonably believed that the plaintiff was in violation of the five-raptor rule.

As the plaintiff argues, however, *Nieves* recognizes a "narrow qualification" to the rule that the existence of probable cause "should generally defeat a retaliatory arrest claim." *Nieves*, 139 S. Ct. at 1727. That is, "where officers have probable cause to make arrests, but typically exercise their discretion not to do so, . . . an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" *Id.* (quoting *Lozman v. City of Riviera Beach*, , 138 S. Ct. 1945, 1953 (2018)). The Court

held that "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*

Lamar notes that she has brought an equal protection claim here (discussed below) and, further, that she alleges that other individuals whom Boles knew possessed more than five raptors were not prosecuted. And she argues that, even if she did break the law (which she expressly does not concede), "she has still stated a claim for relief by alleging the Defendants typically refrained from making arrests or seizures for such violations but exploited these powers against only her as a means of suppressing her speech." (Doc. No. 20, at 32.) In their Reply, the defendants simply reiterate that Boles reasonably believed the plaintiff was in violation of the law. (Doc. No. 23, at 6.)

The court finds that, at this juncture, the plaintiff has adequately stated a claim for First Amendment retaliation, insofar as she alleges that the defendants, and specifically Boles, "knew that other falconers in Tennessee were engaging in the same activities as Plaintiff with their birds with respect to propagation, possession, and education, such as possessing more than five raptors and charging money for shows and education while having the same (or fewer) permits as Plaintiff Lamar," but the defendants "took no legal action against them." (Doc. No. 1 ¶¶ 28, 21, 170.)

The Complaint adequately pleads First Amendment retaliation. Moreover, the constitutional right not to be arrested or prosecuted in retaliation for engaging in protected speech has long been established, such that the defendants are not entitled to qualified immunity, at least at this stage.[16] The Motion to Dismiss this claim will be denied.

---

[16] It is unclear whether the plaintiff intended to state a First Amendment retaliation claim against Norman, whose name is not mentioned under the section setting forth the basis for this

F.        **Count Five: Equal Protection**

Lamar's claim based on violation of the Equal Protection Clause is expressly asserted against only Boles and Norman. (*See* Doc. No. 1 ¶¶ 169–71.) In support of this claim, she alleges that defendants Boles and Norman purposefully and intentionally treated her differently under the same facts and circumstances than it treated male falconers in Tennessee. More specifically, though without identifying individuals, she alleges that Boles and Norman were aware of male falconers in Tennessee who, like her, possessed more than five "raptors" and charged money for demonstrations involving such birds but that Boles and Normal took no legal action against these male falconers. She asserts that Boles and Norman selectively enforced (and misapplied) the law against her because of her gender and, further, that they told male falconers that, once the TWRA had made the case against Lamar, the laws would be changed to be more favorable to falconers and that they did not need to worry about the current laws being enforced against them. (*Id.* ¶ 170.) She alleges that Boles made specific statements against her that reflected an "anti-female animus," insinuating that she would not be able to pass the test for obtaining a state Animal Control Permit "due to her gender." (*Id.* ¶¶ 171, 26.) Alternatively, the plaintiff alleges that she was a "class of one" whom the defendants treated differently from similarly situated others without a rational basis due to animus or ill-will against her.

The court construes the claim as one for selective prosecution (or selective enforcement) in violation of the Equal Protection Clause. To state a viable claim under this theory, the plaintiff must allege facts supporting three elements: "First, [the state actor] must single out a person belonging to an identifiable group . . . for prosecution even though he has decided not to prosecute

---

claim. The defendants have not raised this issue, however, and the court declines to do so *sua sponte*.

persons not belonging to that group in similar situations. Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the *group* which the defendant belongs to." *Rieves v. Town of Smyrna*, 959 F.3d 678, 700 (6th Cir. 2020) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)) (alterations and emphasis in the original). Similarly, to state a class-of-one equal protection claim based on selective enforcement, a plaintiff must allege that "[1] she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020) (White, J., concurring) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). To prove a claim based on this theory, the plaintiff must show that she and the others who were treated differently were "similarly situated in all relevant respects." *Id.* (quoting *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012)). She can show that "a government action lacks a rational basis in one of two ways: either by negativ[ing] every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)).

The defendants argue that the claim against Rider should be dismissed, because the Complaint fails to state an equal protection claim against him individually. As set forth above, the Complaint makes it clear that the plaintiff did not intend to state an equal protection claim against Rider, so this argument wins the defendants nothing.

They also argue that, because probable cause supported the search of the plaintiff's property and the criminal summonses issued as a result of that search, the claim fails. This argument is likewise unavailing, because "the determination of probable cause does not preclude a plaintiff from pursuing a claim that the state chose to prosecute her due to invidious

discrimination." *Stemler*, 126 F.3d at 872. The Sixth Circuit and the Supreme Court, in fact, "have long held that a selective enforcement claim may be available even where there is probable cause for prosecution." *Id.* (citing *Wayte v. United States*, 470 U.S. 598, 607 (1985)).

Defendants Boles and Norman have not shown that they are entitled to dismissal of this claim.

### G. Count Two: Substantive Due Process

Count Two of the Complaint asserts a violation of the plaintiff's right to substantive due process under the Fourteenth Amendment. In support of this claim, Lamar alleges that Boles caused her to rely on information on the TWRA website with the outdated regulation and then, despite knowing she had relied on that information, "unfair[ly] and outrageous[ly] pursued enforcement under the current version of the regulation"; Boles knowingly chose to pursue action against her, even though other individuals in Tennessee with falconry permits possessed "potentially even more raptors" than Lamar; Boles targeted her for "excessive, unnecessary, and illegal action. . . out of personal animus"; Boles seized her birds without prior warning, including birds over which the TWRA had no jurisdiction, and including even the five birds he acknowledged her permit allowed her to possess; Boles provided the officials with the U.S. Fish and Wildlife Service false information (*i.e.*, that she already possessed more birds than allowed) that caused them to decline to issue Lamar an importation permit that would have allowed her to bring birds she owned in Canada into the United States; Boles made false and defamatory statements about Lamar to others in the falconry community; Boles refused to provide Lamar a Tennessee Animal Damage Control Permit or the "necessary processes" to get one; Boles falsely told her that she would need to pass a Wildlife Damage Control training program in order to obtain a state Animal Damage Control Permit; after seizing her birds, Boles and Norman refused to provide her with information about her birds; the defendants collectively acted "outrageously" by

unnecessarily seizing all of the plaintiff's birds from a place where they were well cared for and placing them in locations that they knew or should have known were not equipped to care for them properly; and Rider "approved and facilitated" the seizure of Lamar's birds and subsequent criminal charges after telling her the TWRA would not take action until legal counsel could be consulted. (Doc. No. 1 ¶¶ 121–44). She asserts that the defendants' actions "violated [Lamar's] substantive due process rights through a series of acts [that] are so outrageous as to 'shock the conscience.'" (Doc. No. 20, at 18; *see also* Doc. No. 1 ¶ 146 ("The conduct of Defendants, individually and collectively, constituted government activity which lacked reasonable justification, was arbitrary and capricious, and shock[ed] the conscience and thus violated Plaintiff's Fourteenth Amendment rights and caused her to suffer injury.").)

The defendants argue that the plaintiff has failed to allege any action by the defendants that violated a specific constitutional guarantee or that qualifies as conscience shocking. They also argue that the TWRA regulations enforced against the plaintiff are rationally related to the state's legitimate interest in the protection, preservation, and conservation of wildlife within the state. The plaintiff argues to the contrary, insisting that the defendants' actions qualify as conscience shocking. She does not dispute the validity of the applicable regulations or deny that they are grounded in legitimate state interests; she simply contests the defendants' interpretation of the regulations and their unfair enforcement of them (as misapplied) to her alone.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The due process clause has both procedural and substantive components." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). "The touchstone of due process is protection of the individual against arbitrary action of government, [including] the exercise of power without any

reasonable justification in the service of a legitimate government objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (internal quotation marks omitted). That is, the purpose of the Due Process Clause is "to protect the people from the State." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).

Substantive due process is "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Range*, 763 F.3d at 588 (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). Substantive due process protects "a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" *Id.* (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003)).

The scope of protection offered by substantive due process is narrow, and the Supreme Court has "always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Albright v. Oliver*, 510 U.S. 266, 271–72 (1994) (citation omitted). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Id.* at 272. Except in narrow circumstances not at issue here,[17] substantive due process has *not* typically been extended to situations involving "claim[s] to be free from prosecution except on the basis of probable cause." *Id.* Moreover,

---

[17] In his concurrence in *Albright*, Justice Souter suggested that there may be "exceptional cases where some quantum of harm occurs in the interim period after groundless criminal charges are filed but before any Fourth Amendment seizure" that might "reveal a substantial deprivation of liberty" sufficient to state a substantive due process claim. *Albright*, 510 U.S. at 291 (Souter, J., concurring); *see also Howard v. Livingston Cty.*, No. 21-1689, 2023 WL 334894, at *12 (6th Cir. Jan. 20, 2023).

"[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Id.* at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In *Albright*, the Court "freely conceded" that the Due Process Clause is "intended to secure the individual from the arbitrary exercise of the powers of government" but noted that it did not follow from this conclusion that "the only inquiry mandated by the Constitution is whether, in the view of the Court, the governmental action in question was 'arbitrary.'" *Id.* at 272 (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)).

The Sixth Circuit has suggested that, in assessing a substantive due process claim, the court should "evaluate whether the conduct would not be 'shocking' under the substantive due process test but for the violation of an enumerated constitutional right; if so, that enumerated right governs instead of due process." *Howard*, 2023 WL 334894, at *12 (6th Cir. Jan. 20, 2023) (citing *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012)). Here, in support of her substantive due process claim, the plaintiff essentially reincorporates all of the actions alleged in support of her claims for violations of specific rights guaranteed by the First, Fourth, and Fourteenth Amendments. It is not completely clear at this juncture whether some of the conduct that falls outside those particular protections—including the housing of the plaintiff's birds at inadequate facilities, defaming her to others in the falconry community, and generally depriving her of an ability to make her livelihood from her falconry-related activities (including education and potentially animal control)—might qualify as "conscience-shocking." Even assuming a constitutional violation occurred, however, the court is constrained to find that the defendants are entitled to qualified immunity as to this claim.

In *Howard*, the Sixth Circuit granted qualified immunity under facts not dissimilar from those presented here, on the basis that it could not conclude at the time that no "reasonable official would, at the time the act was committed, understand that his conduct violated a clearly established right." *Howard*, 2023 WL 334894, at *12 (6th Cir. Jan. 20, 2023). In that case, the Sixth Circuit reiterated that, under established law, "where an enumerated constitutional Amendment 'provides an explicit textual source of the constitutional protection' against government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* (quoting *Graham*, 490 U.S. at 395; *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 (6th Cir. 1999) (en banc)). It also found that, in that case (unlike this one), the plaintiff's allegations appeared to allege facts sufficient to invoke the potential "rare exception" anticipated by Justice Souter in his concurring opinion in Albright. (*See* Note 17, *supra.*) It also found that the plaintiff's substantive due process claim was not necessarily subsumed by her First Amendment retaliation claim, unlike in *Handy-Clay*, because the plaintiff did not only allege that she was terminated from her job in retaliation for her protected speech; she also alleged that the defendants "intentionally subjected her to a sustained malicious prosecution" that the court found could "shock the conscience regardless of whether they did so in retaliation for her protected speech." *Id.*

In other words, it found that the plaintiff stated a substantive due process claim. But it also found that the defendants were entitled to qualified immunity, because

> existing precedent does not clearly establish that a plaintiff alleging a First Amendment retaliation claim may also obtain relief under substantive due process. Given our decisions in *Thaddeus-X* and *Handy-Clay*—which held that certain claims for First Amendment retaliation preclude reliance on substantive due process—Howard's substantive due process right was not clearly established at the time of Defendants' alleged conduct to provide them with "fair warning" that their conduct would constitute a substantive due process violation.

*Id.* at *13 (internal citations omitted). The court therefore reversed the district court's denial of

qualified immunity on the plaintiff's substantive due process claim.

The decision in *Howard* was issued in January 2023, before this lawsuit was filed but after the events giving rise to the plaintiff's claims took place. This court likewise finds that, at the time of the events in question, it was not clearly established by existing precedent that the plaintiff, alleging a First Amendment retaliation claim, along with various Fourth Amendment and equal protection claims, could also obtain relief under substantive due process. Accordingly, even assuming that the facts as alleged by the plaintiff are sufficient to support a substantive due process claim, clearly established precedent would not have alerted reasonable officers to that possibility at the time of their actions. The court will, therefore, dismiss this claim on the basis of qualified immunity.

## VI. CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the Motion to Dismiss. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge